**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| QUANN LOWE ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 09 C 4150 |
| v. ) | |
| ) | Magistrate Judge Sheila Finnegan |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Quann Lowe brings this action under 42 U.S.C. § 405(g), seeking judicial review of the Administrative Law Judge ("ALJ")'s decision denying Plaintiff's application for Supplemental Security Income ("SSI"). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff moved for summary judgment, seeking reversal of the ALJ's decision and an award of benefits. The Commissioner of Social Security ("Commissioner") then filed a motion to remand the case for further proceedings, which Plaintiff opposed, insisting instead on an outright award of benefits.[1] The Court denied the Commissioner's motion for remand because it did not address all of the grounds for reversal raised by Plaintiff in his motion for summary judgment, and set a schedule for further briefing on Plaintiff's motion. After careful review of the parties' briefs and the record, the Court now denies Plaintiff's request for an outright award of benefits but remands the case for further proceedings consistent with this ruling.

---

[1] On April 26, 2010, the case was reassigned to this Court for all further proceedings.

## **PROCEDURAL HISTORY**

Plaintiff received SSI as a child due to an impairment called bilateral internal tibial torsion.[2] In 2002, when he was 18 years old, the Social Security Administration reviewed his case and determined that he was no longer disabled. (R. 17.) After a hearing before ALJ Dan Dadabo on February 8, 2005, his benefits were terminated. (R. 15-17; Pl.'s Mem. 3.)

Plaintiff did not appeal that decision. Instead, on October 19, 2006, he filed a new application for SSI, alleging he was disabled since his birth on May 16, 1984. (R. 175.) His application was denied initially on January 23, 2007 and again on reconsideration on May 24, 2007. (R. 87-91, 95-98.) Pursuant to Plaintiff's request, ALJ Michael McGuire held an administrative hearing on August 5, 2008 and a supplemental hearing on September 2, 2008. (R. 41, 60, 99.) Plaintiff, who appeared at the hearings with counsel, and a vocational expert testified before the ALJ.

On December 18, 2008, ALJ McGuire found that Plaintiff was not disabled based on the Medical-Vocational Guidelines (the "Grid"). (R. 14.) The Appeals Council denied Plaintiff's request for review. (R. 1.) Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. In support of his request for reversal and an award of benefits, Plaintiff argues the ALJ erred by: (1) applying the Grid to determine that Plaintiff was not disabled; and (2) failing to call a medical expert to determine whether Plaintiff's impairments meet or equal Listing 1.02 for major dysfunction

---

[2] Internal tibial torsion is a condition in which the tibia (the larger of the two bones going from the knee to the ankle, forming the shin) is rotated inwardly, causing the foot and ankle to be rotated. The condition often corrects itself as the child grows. *See* http://www.child rensmemorial.org/depts/orthopaedic/tibial-torsion.aspx, last viewed on November 4, 2010.

2

of joint(s) or Listing 1.13 for muscular dystrophy. If his impairments met one of the listings, he would be considered disabled.

## FACTUAL BACKGROUND

Plaintiff was born on May 16, 1984 and was 24 years old at the time of his most recent hearing before the ALJ. (R. 48, 208.) He has been diagnosed with achondroplasia dwarfism, possible muscular dystrophy of the lower extremities, muscular atrophy of the lower extremities, arthralgia (joint pain) of the knees and lower back, and a learning disability affecting his reading. (R. 272, 302-04.) He attended high school through the eleventh grade, but he received special education services and reads at only a first grade level. (R. 253, 260-61.) He has never been employed. (R. 48-49.)

**A.     Medical History**

**1.     Physical Condition**

The earliest medical records provided to the Court are from Reymar Clinic, where Plaintiff was seen on August 17, 2001, when he was 17 years old, and again on June 13, 2002, when he was 18. The clinic's records indicate that he was diagnosed with achondroplasia dwarfism and muscle atrophy in both legs. (R. 302-03.)

On November 21, 2006, Dr. Norma Villanueva performed a consultative examination of Plaintiff for the Bureau of Disability Determination Services ("DDS"). (R. 270-75.) Plaintiff, who was 22 at the time, told Dr. Villanueva that he had problems with his lower extremities since he was little, that he had daily pain in his knees and lower back, and that the pain had been worsening since 2000. He said he experienced increased pain after walking two blocks, climbing one flight of stairs, or standing for thirty minutes, and his lower

3

back hurt on bending. He also told Dr. Villanueva that he had been seen by a doctor the year before, who told him to rub alcohol on his knees and back when they hurt. (R. 270.)

Dr. Villanueva observed that Plaintiff's lower extremities from the distal third of both thighs to the feet were atrophied and that his range of motion in both knees and the lumbar spine were limited. She noted that there was tenderness in the knees and spine but no swelling. (R. 271.) An x-ray of the right knee taken on November 21, 2006 showed no significant abnormality. (R. 276.) Plaintiff's gait was slow but stable. His lower extremity strength was 5/5 bilaterally. His sensation was intact. His deep tendon reflexes were 1+ in the lower extremities and 2+ in the upper extremities and hips. (R. 271.) Dr. Villanueva reported that Plaintiff had (1) possible muscular dystrophy in the lower extremities from the distal third of the thigh down to the foot and that the lower extremities were atrophied; (2) a history of a learning disability; and (3) arthralgia of the knees and lower back, which was possibly arthritis. (R. 272.)

On December 8, 2006, Dr. Marion Panepinto completed a Physical Residual Functional Capacity Assessment of Plaintiff for DDS. (R. 294-301.) Dr. Panepinto found that Plaintiff could occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds, and his ability to push/pull was "unlimited, other than as shown for [his ability to] lift and/or carry." (R. 295.) He could stand, walk or sit with normal breaks for about 6 hours in an 8 hour workday. He could occasionally climb a ramp or stairs, balance, stoop, kneel, crouch and crawl, but he could not climb a ladder, rope or scaffolds. Dr. Panepinto indicated that Plaintiff had no other physical limitations. (R. 294-301.)

Dr. Frank Jimenez completed another Physical Residual Functional Capacity Assessment of Plaintiff for DDS on May 11, 2007. Dr. Jimenez determined that Plaintiff

4

could occasionally lift/carry only 10 pounds, and he could frequently lift/carry less than that. He could stand and walk at least 2 hours in an 8 hour workday, and he could sit for about 6 hours. Dr. Jimenez found that Plaintiff's ability to push and pull was limited in his lower extremities. He found that Plaintiff could occasionally climb ramps and stairs, but not a ladder, rope or scaffold, and he was able to occasionally balance, stoop, kneel, crouch and crawl. (R. 329-36.)

### 2. Learning Disability and Mental Condition

In September 2003, when Plaintiff was 19 years old, he was evaluated by school officials to determine his eligibility for special education services. (R. 260-62.) The report indicates that he had a history of receiving special services to address learning disabilities. (R. 261.) Although he was in eleventh grade, his reading ability was measured at a first grade level and his math ability was measured at a fifth grade level. (R. 260.) A psychological evaluation revealed that he had extreme difficulty in pronouncing both simple and more complex words, and that he appeared to have suppressed long term memory. (R. 266-67.)

Plaintiff was evaluated again by school officials in November 2004. They concluded that he was able to be in regular classes provided that he received supplementary aides and services, including: (1) extended time for class assignments and homework; (2) explanations of directions with concrete examples and simplification; (3) testing on one concept at a time; (4) use of a calculator or computer; and (5) verbal examples in clearly stated steps. (R. 253.)

5

On January 16, 2007, Dr. Terry Travis performed a consultative psychiatric review for DDS. Dr. Travis found no medically determinable mental impairment. (R. 280, 292.) Dr. Leon Jackson affirmed those findings on May, 17, 2007. (R. 326-27.)

**B.     August 5, 2008 Hearing**

    **1.     Plaintiff's Testimony**

At the August 5, 2008 hearing, Plaintiff was 24 years old. He testified that he attended school through the eleventh grade with special education classes and that he has a hard time reading. (R. 48, 53.) He testified that he has never worked and said he cannot work because his back and legs hurt. (R. 48-49.) He testified that he can stand for maybe 15 to 20 minutes before needing to sit down. (R. 49.) He can walk about a block and a half and then his knees start to bother him and he feels like he can no longer support himself. (R. 49-50.) He said he can carry a gallon of milk, but his back would hurt if he carried two gallons of milk because he would need to lean over. (R. 52.) Plaintiff testified that when he was in school, he attended gym class, but he did not participate in all the activities. He sat and watched as the other students ran around and played sports. He did certain exercises, but not to the same extent as the other students. For example, he said, if the other students did 15 or 20 jumping jacks, he might do 10, and then the instructor would tell him to sit down because he could tell Plaintiff was "hurting." (R. 50.)

At the time of the hearing, Plaintiff was no longer in school. (R. 46-47.) He testified that he spends his days mostly sitting. (R. 51.) He plays with his kids (ages 8, 2, and 1) and watches TV. (*Id.*) He lives with his mother and aunt. He sometimes washes dishes and takes out the garbage, and he makes sure his bedroom is straightened up. (R. 52-53.) He said he usually stays upstairs, where his bedroom is located, for most of the day

because going up and down the stairs hurts his knees and back, but he does go downstairs occasionally. (R. 53) Plaintiff testified that he does not take medication for his pain. (R. 49.)

### 2. Vocational Expert Testimony

Lee O. Knutson testified at the hearing as a vocational expert ("VE"). The ALJ asked the VE whether there were any jobs that could be done by someone of Plaintiff's age, education and vocational background, who can lift or carry 10 pounds, stand or walk for two hours in an eight hour day, but cannot stand any longer than 20 minutes at a time, who can sit for six hours, push or pull 10 pounds, engage in occasional crouching, kneeling, crawling, balancing, stooping, and who is limited to the performance of unskilled work that can be learned solely by verbal instruction and demonstration and which does not require reading of any kind or does not require reading above a first grade level. (R. 54-55.) The VE testified that there were approximately 2,900 bench assembler jobs, 1,000 inspector/weigher/checker jobs, and 1,800 hand packager jobs in the Chicago primary metropolitan area that could be performed by someone with those restrictions. (R. 55.) However, if the individual was unable to keep up with the jobs' regular production rates, or if he required an excessive amount of supervision, he probably would not be able to keep any of these jobs. (R. 56-57.)

Following the VE's testimony, Plaintiff's counsel requested a two week period in which to submit a written response. (R. 58.) On August 15, 2008, Plaintiff submitted a post-hearing letter challenging the validity of the VE's testimony regarding the availability of jobs that could be performed by someone with Plaintiff's impairments. (R. 153-56.)

Plaintiff argued that the positions identified by the VE required literacy skills above Plaintiff's level. (R. 156.) Plaintiff also questioned whether the identified jobs still existed. (R. 153.)

**C.     September 2, 2008 Hearing**

The ALJ held a supplemental hearing on September 2, 2008 to address Plaintiff's challenges to the VE's testimony. At the hearing, Plaintiff's counsel suggested that the Dictionary of Occupational Titles ("DOT") language classifications assigned to the jobs the VE had identified at the earlier hearing appeared to require language skills greater than a first grade reading level. (R. 68, 78.) According to Plaintiff's counsel, the DOT describes the 01 Language Development (or "L1") classification (which was assigned to two of the three jobs identified by the VE[3]) as requiring the ability to recognize the meaning of 2,500 two or three syllable words, read at a rate of 95 to 120 words per minute, compare similarities and differences between words and between series of numbers, print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses. (R. 63-64, 67.) In response, the VE noted that L1 was the lowest DOT language classification and therefore should cover illiterate and non-English speaking workers as well. (R. 71-72, 74, 78-79.) He further testified that, in his opinion, which was based on his experience, reading was not required for the jobs he identified, and they could all be learned by demonstration. (R. 74, 76, 79.) However, the VE did agree the DOT language classifications for the jobs he identified were not consistent with the limitations given in the ALJ's hypothetical. (R. 75-76, 79.)

---

[3]     The DOT classifies the other job as requiring language skills at L2, which is a step higher than L1. (R. 75-76.)

The VE also testified that he was unable to identify specific companies with the jobs he identified at the earlier hearing without doing further research. (R. 79-81.) The ALJ gave him 30 days to furnish a list of companies with these jobs. (R. 81.)

**D.    VE's Labor Market Research Report**

On October 1, 2008, the VE submitted a report summarizing his labor market research and addressing other issues raised at the supplemental hearing. He stated that he classifies jobs in the DOT based on their physical demand and skill levels and "may at times overlook the less frequently used codes" for math and language development. (R. 235-36.) He explained that in his experience the aptitude and ability tests of workers often do not match the "theoretical" educational development levels suggested by the DOT. (R. 236.) The VE acknowledged that the DOT L1 classification involves the ability to read at a rate of 95-120 words per minute. He stated that L1 is the lowest level on the scale "so it does not have a rating for [an] individual who does not read or write in English." (R. 236.) He noted, however, that Plaintiff had eleven years of education. (R. 236.)

With respect to identifying companies in the Chicago area that have the jobs he previously identified, the VE contacted eleven companies. He reported that four of the eleven companies had employees working in sedentary, unskilled jobs that do not require reading and writing, one of which described the jobs as special projects. He identified two companies that employed individuals for sedentary work, but he did not indicate in the report whether these jobs have any literacy requirements. A job placement company reported that it had 10-25 requests for assemblers in light and sedentary work but indicated that the jobs usually require an ability to follow basic blueprints. Another job placement

9

company reported that it had no sedentary work available. The VE was unable to reach or obtain information from the remaining three companies. (R. 236-39.)

**E.     ALJ's Decision**

Following the hearings and review of the medical evidence, ALJ McGuire denied Plaintiff's application for SSI. He reviewed Plaintiff's claim under the standard five-step analysis. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful employment. (R. 10.) At step two, the ALJ found that Plaintiff had the following severe impairments: "possible muscular dystrophy/left extremity muscle atrophy, and a learning disorder (reading)." (R. 10.) The ALJ concluded that Plaintiff's "muscle wasting and learning disorder clearly have more than a minimal impact on his ability to perform work." (R. 11.)

At step three, the ALJ found that Plaintiff's impairments do not meet or medically equal any impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) Specifically, he found that Plaintiff's "possible muscular dystrophy or dwarfis[m] do not meet or equal the severity of any of the neurological listings," nor "does his condition fulfill any of the requirements under musculoskeletal impairments." (*Id.*) The ALJ noted that, "although he had bilateral muscle atrophy in the lower legs, he is able to move about well and has no gross disturbances of gait or station." (*Id.*) The ALJ also concluded that Plaintiff's mental impairment does not meet or medically equal the criteria of Listing 12.02 for Organic Mental Disorders. (*Id.*)

The ALJ then considered Plaintiff's residual functional capacity and found that Plaintiff was capable of performing "less than a full range of sedentary work." (R. 11-12.) He found that Plaintiff was "limited to lifting and carrying 10 pounds; walking and standing

10

two hours, but no more than 20 minutes at a time; pushing and pulling 10 pounds; no climbing; occasional crouching, crawling, kneeling, balancing, and stooping; performing unskilled work that can be learned only by verbal instruction and demonstration, and which does not requir[e] reading above 1st grade level as defined in 20 C.F.R. 416.967(a)." (R. 11-12.)[4] The ALJ noted that, although he found Plaintiff "generally credible as to his impairments," he was "not persuaded that his impairments are serious enough to prevent him from working." (R. 12.) The ALJ indicated that he was relying on the Residual Functional Capacity Assessment prepared by Dr. Jiminez rather than Dr. Pinepinto's assessment, because Dr. Pinepinto did not have access to all the medical evidence and Dr. Jiminez's assessment was more recent. (R. 13.)

At step four, the ALJ found that Plaintiff had no past relevant work. (*Id.*) At step five, the ALJ found there are jobs that exist in significant numbers in the national economy that Plaintiff can perform and therefore concluded that Plaintiff was not disabled. (*Id.*) The ALJ did not rely on the VE's testimony in making this determination because the ALJ found that the VE's documentation did not support his testimony. (R. 14.) Instead, the ALJ relied on the Grid, stating: "Based on a residual functional capacity for the full range of sedentary work, considering the claimant's age, education, and work experience, a finding of 'not disabled' is directed by Medical-Vocational Rule 201.24." (*Id.*)

---

[4] 20 C.F.R. § 416.967(a) defines the physical requirements of sedentary work as work that "involves lifting no more than 10 pounds at any time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." It also explains that sedentary work often requires occasional walking and standing. The ALJ may have meant to refer to 20 C.F.R. § 416.968(a) instead, which defines unskilled work, in part, as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."

11

## **DISCUSSION**

### A. Standard of Review

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart,* 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* (citations omitted). The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "so long as it is 'sufficient for a reasonable person to accept as adequate to support the decision.'" *Ketelboeter v. Astrue,* 550 F.3d 620, 624 (7th Cir. 2008) (quoting *Jens v. Barnhart,* 347 F.3d 209, 212 (7th Cir. 2003)).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citations omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue,* 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart,* 290 F.3d 936 940 (7th Cir. 2002)).

**B.     Disability Standard**

In order to qualify for SSI, Plaintiff must be found "disabled" under the Social Security Act. 42 U.S.C. § 1381a.  A person is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(A).  In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry:  (1) Is the claimant presently unemployed?  (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work?  20 C.F.R. § 416.920; *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).  In order to determine whether the claimant can perform any past relevant work (step four), the ALJ assesses the claimant's residual functional capacity ("RFC"). 20 C.F.R. § 416.945.  The RFC is defined as the most that an individual can do in light of the physical and mental limitations that affect his ability to perform work-related activities.  *Id.*  The burden of proof is on the claimant through step 4; the burden then shifts to the Commissioner at step five.  *Clifford,* 227 F.3d at 868.

**C.     Analysis**

In support of his motion, Plaintiff argues that the ALJ erred at step five by using the Grid to direct a finding of not disabled.  He seeks both reversal of the ALJ's decision and an award of benefits, arguing that an award of benefits is appropriate because the VE's labor market research report shows that there are not a significant number of jobs that

Plaintiff could do, and because the ALJ failed to sustain his burden at step five. Plaintiff also argues that the ALJ erred at step three by failing to obtain medical testimony to determine whether Plaintiff's impairments meet or equal Listing 1.02 for major dysfunction of joint(s) and/or Listing 11.13 for muscular dystrophy. The Court addresses each of Plaintiff's arguments below.

1. **The ALJ's Step Five Determination**

At step five, the Commissioner bears the burden of proving that there are sufficient jobs in the national economy for a hypothetical person with the same impairments that claimant has. *Borski v. Barhnart,* No. 01-2270, 2002 WL 521379, at *3 (7th Cir. Apr. 5, 2002). There are two ways to do this. The regulations provide a Grid, which the ALJ must use if the claimant's residual functional capacity, age, education and past work experience fit precisely within the criteria of one of the Grid's rules. *Id.; see also* 20 C.F.R. § 416.969; 20 C.F.R. Part 404, Subpart P., App. 2 § 200.00. In those cases, the Grid rules direct a finding of disabled or not disabled. *Id.* If the claimant's characteristics do not match a Grid rule, the ALJ must consider more particularized evidence about the jobs that would be available for the claimant. *Id.*

Here, both parties agree that the ALJ's reliance on the Grid is not supported by substantial evidence. The ALJ concluded that "[b]ased on a residual functional capacity for the full range of sedentary work, considering the claimant's age, education, and work experience, a finding of 'not disabled' is directed by Medical-Vocational Rule 201.24." (R. 14.) However, he previously found that Plaintiff could perform *less* than the full range of sedentary work, and that RFC does not fit precisely within a Grid rule. The ALJ did not address this inconsistency or explain his use of the Grid in light of his earlier RFC finding.

14

As a result, his determination that the Grid directed a finding of not disabled is not supported by substantial evidence.

As previously noted, the parties agree on this point; they disagree, however, on what effect the ALJ's error has on the case. The Commissioner argues that the case should be remanded so that the ALJ can clarify his RFC finding and then properly proceed with step five, while Plaintiff argues that this Court should order an award of benefits.

An award of benefits is appropriate only if all the relevant factual issues have been resolved and the record supports a finding of disability. *Brisco ex rel. Taylor v. Barnhart,* 425 F.3d 345, 356 (7th Cir. 2005). A court does not have the authority to award SSI on grounds other than those provided under 42 U.S.C. § 1381a, and the statute requires that the claimant must be disabled, blind or aged under the Act in order to qualify for benefits. *See* 42 U.S.C. § 1382a; *Brisco,* 425 F.3d at 356 (citations omitted). Thus, when an ALJ's decision is not supported by substantial evidence, a remand for further proceedings is the appropriate remedy unless the evidence before the court compels an award of benefits. *Brisco,* 425 F.3d at 356 (citing *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993)).

In this case, remand is appropriate because there are unresolved factual issues and the current record does not support a finding of disability. First, the record is unclear as to what the ALJ determined to be Plaintiff's RFC. Although the ALJ first stated that Plaintiff could perform less than the full range of sedentary work and listed specific restrictions, he later applied the Grid rule for someone who can perform the full range of sedentary work. Second, if Plaintiff's RFC is in fact less than the full range of sedentary work, the Grid does not direct a finding of disabled or not disabled, and that leaves open the question of whether there is work that Plaintiff can perform. Although the ALJ called a VE to testify on

this issue, he ultimately (and appropriately) disregarded the VE's testimony. Consequently, the record lacks sufficient evidence regarding whether there are a significant number of jobs that Plaintiff can do.

Plaintiff points to the VE's labor market survey report, arguing that it supports an award of benefits because it shows that there are only one to thirty jobs in the Chicago area involving sedentary work and not requiring literacy. But the report indicates that the VE found approximately thirty jobs after attempting to contact only eleven companies. There is no indication that the report reflects an exhaustive search. In fact, the report goes on to state that there are approximately 13,000 manufacturing employers in the area, suggesting that at least some of these employers might have the types of jobs at issue here. (R. 239.) Based on this record, the Court simply cannot determine whether there are a significant number of jobs that Plaintiff could do.

Plaintiff argues that the Court should award benefits anyway because the Commissioner failed to sustain his burden at step five and should not be given a second opportunity to do so. In making this argument Plaintiff "seeks to hold the Commissioner to the same standards as other litigants: if [he] does not meet [his] burden then plaintiff wins and can collect benefits; the Commissioner gets no second chance." *Gotz v. Barnhart,* 207 F. Supp. 2d 886, 903 (E.D. Wis. 2002). But this is not the law. *Id.*

"Because of the nonadversarial nature of Social Security disability determinations, the Commissioner is not a litigant and has no representative at the agency level. Indeed, the model is investigatory, or inquisitorial, rather than adversarial." *Id.* (quoting *Seavey v. Barnhart,* 276 F.3d 1, 8 (1st Cir. 2001)). At the ALJ level the claimant is the only litigant presenting evidence. *Id.* Accordingly, when an ALJ fails to obtain sufficient vocational

evidence, it "is an adjudicator making a mistake, not a party litigator failing to present evidence." *Id.* The proper remedy for errors at step five, therefore, is not usually an automatic award of benefits but rather a remand for further proceedings. *Id.; Seavey,* 276 F.3d at 10-13.

This does not mean that the Commissioner gets "endless opportunities to get it right." *Id.; Seavey,* 276 F.3d at 13. "Where 'the delay involved in repeated remands has become unconscionable,' or the agency has displayed 'obduracy' in complying with the law, the court may step in and award benefits." *Id.* (quoting *Seavey,* 276 F.3d at 13; *Wilder v. Apfel,* 153 F.3d 799, 804 (7th Cir. 1998)). This, however, is not such a case. Therefore, remand for further proceedings is appropriate.

### 2. The ALJ's Step Three Determination

Plaintiff also argues that the ALJ should have obtained medical testimony to determine whether Plaintiff's impairments meet or equal Listing 1.02 for major dysfunction of joint(s) and/or Listing 11.13 for muscular dystrophy. It is the claimant's burden to establish that his impairments meet a listing, and to do so he must show that his impairments meet or equal "*all* of the specified medical criteria" in the listing. *Coleman v. Astrue,* No. 07-1729, 2008 WL 695045, at *5 (7th Cir. 2008) (quoting *Sullivan v. Zebley,* 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (emphasis in original)). That said, the ALJ also has a duty to develop a full and fair record and must obtain additional evidence when it is necessary to resolve a material issue. *Clayborne v. Astrue,* No. 06 C 6380, 2007 WL 6123191, at *4 (N.D. Ill. Nov. 9, 2007); *Carroll v. Barnhart,* 291 F. Supp. 2d 783, 795 (N.D. Ill. 2003).

17

Here, the ALJ relied upon then-current medical evidence in finding that Plaintiff's impairments do not meet or equal any of the musculoskeletal listings, which include 1.02, or the neurological listings, which include 11.13. (R. 11.) One of the requirements for Listing 1.02 is that the claimant demonstrate an "inability to ambulate effectively." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00 (B)(2)(a). An inability to ambulate effectively means an extreme limitation of the ability to walk that interferes very seriously with an individual's ability to initiate, sustain, or complete activities. *Id.* § 1.00 (B)(2)(b)(1). Ineffective ambulation is defined generally as a limitation so serious that it does not permit ambulation without the use of a hand-held assistance device limiting the use of both upper extremities. *Id.* § 1.00 (B)(2)(b)(1). Examples include the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, and the inability to climb a few steps with the use of a single hand rail. *Id.* § 1.00 (B)(2)(b)(2).

The medical records and Plaintiff's testimony establish that he does not meet this requirement. Dr. Villanueva reported that Plaintiff's gait was "slow and stable." (R. 271.) Dr. Jiminez's physical RFC assessment concluded that Plaintiff could stand and walk for at least two hours in an eight hour work day and that he could occasionally climb stairs. (R. 329-36.) At the hearing before the ALJ, Plaintiff testified that he was able to walk a block and a half before his knees would hurt and that he participated in some gym activities at school, including jumping jacks. (R. 49-50.) He testified that his bedroom was upstairs and he was able to go downstairs and did so occasionally even though it hurt his knees and back. (R. 53.) Also, at an earlier proceeding in 2005, Plaintiff's mother testified that he walked to school which was approximately 12 to 13 blocks from home. (R. 22.) Finally,

18

there is no indication in the record that Plaintiff used or needed the assistance of a walker, crutches or canes.[5] As such, there is substantial evidence supporting the ALJ's finding that Plaintiff's impairments do not meet Listing 1.02, and nothing in the record suggests a need for additional medical evidence on this issue.

Similarly, there is substantial evidence in the record supporting the ALJ's finding that Plaintiff's impairments do not meet or equal Listing 11.13 for muscular dystrophy. That listing requires "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.13. The ALJ determined that Plaintiff's "possible muscular dystrophy or dwarfis[m] do not meet or equal the severity of any of the neurological listings," which include 11.13. (R. 11.) He acknowledged that Plaintiff had bilateral muscle atrophy in his lower legs, but noted that "he is able to move about well and has no gross disturbance of gait or station." (*Id.*) The ALJ's finding is supported by the medical records indicating that Plaintiff's gait is slow but stable and that he has no neurological defects, as well as Plaintiff's testimony regarding his physical capacity. Plaintiff did not offer any new or contradictory medical evidence, nor are there obvious gaps in the record. Under these circumstances, the ALJ was not required to seek additional medical evidence. *See Carroll,* 291 F.3d at 795.

---

[5] Listing 1.02 also requires that the claimant demonstrate (1) a gross anatomical joint deformity, (2) chronic joint pain and stiffness or other limitations in motion, and (3) medical imaging documenting the abnormality. The only evidence of medical imaging in the record is a 2006 x-ray of Plaintiff's right knee, which showed the knee to be normal. (R. 276.)

## **CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 19] is granted in part and denied in part. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Administration for further proceedings consistent with this opinion.

Dated: November 12, 2010

ENTER:

_Sheila Finnegan_
SHEILA FINNEGAN
United States Magistrate Judge